LE BARON MARTIN v. JOHN H. CLARKE et als.

The rule which forbids the introduction of parole evidence to contradict, add to, or vary a written instrument, does not extend to evidence offered to show that a contract was made in furtherance of objects forbidden by statute, by common law, or by the general policy of the law.

Champerty is an offence against the law, whether regard be had to the ancient common law, the English statutes upon the subject, or to the legislative acts of Rhode Island, and therefore avoids every contract into which it enters.

A contract between an attorney and counsellor at law and a client, that the attorney shall prosecute a claim at his own cost and charge, for a part of the subject in litigation, is champertous, illegal and void.

IN equity.   A bill to compel specific performance of a contract for conveyance of lands.

To the bill the defendant Clarke filed a several answer, upon which arose the points discussed and determined.   By consent of parties, an interlocutory decree was entered, in substance, that the complainant have leave to withdraw his replication, and that the cause be heard upon the bill and answer ; and that "in case the Court shall decide that the matters of fact alleged in the answer were sufficient in law, the complainant have leave to file his replication *de novo*, and to have the truth of the matters alleged in said answers determined by a jury, upon proper issues framed by the Court for that purpose."

The facts, other than as set forth in the Court's opinion, were substantially these :—

One Eliza Angell, a maiden lady, possessing a large landed property of great value, by her last will and testament devised the greater portion of it to trustees for certain specified objects, in her view eminently proper and praiseworthy, to the exclusion of her relatives and heirs at law.   This instrument was approved and established by the Court of Probate of North Providence, from whose judgment an appeal was taken to the Supreme Court by one or more of the aggrieved heirs.   This appeal was prosecuted, one Le Baron Martin (one of the heirs) always appearing and acting as the party litigant on behalf of the heirs in gene-

ral; and after three trials before a jury, the testatrix was adjudged to have been of insane mind, and the will was set aside. Thereupon arose a controversy between the said Le Baron Martin and the other heirs at law of the said Eliza,—of whom the defendant Clarke was one,—to adjust and settle which the aid of the Court was invoked by this bill.

The bill alleged, that between said Martin and said heirs there was, at a certain date, negotiations which resulted in contracts under seal, in the words and figures following,—that with the defendant Clarke being the same as the contracts with the others:

" Agreement made the seventh day of October, 1861, by and between John H. Clarke, of the city and county of Providence and State of Rhode Island, and Le Baron Martin, of North Providence, in said county :—

" Whereas, Elizabeth Angell, sometimes called Eliza Angell, late of said North Providence, has deceased, leaving a last will and testament, which was admitted to probate by the Court of Probate of said town of North Providence, and from which an appeal has been taken, and is now pending in the Supreme Court of said county of Providence ; and, whereas, the said Clarke and Martin are both heirs at law of said Eliza Angell, now, therefore, it is agreed by and between the said parties, their respective heirs, executors, administrators and assigns, that the said Martin shall carry on and prosecute the said suit and all proceedings which may be connected therewith, at his own proper costs and charges, and that, in consideration thereof, he, the said Clarke, his heirs and assigns, shall immediately, upon the setting aside of said will or other determination of said suit in favor of the heirs at law of Eliza Angell, convey and assure unto the said Martin, his heirs and assigns, one-half part of all his, the said Clarke's, right, title and interest in and to all the real and personal estate of the said Eliza Angell, at the time of her decease.

" Witness our hands and seals, the day aforesaid."

In virtue of this agreement, the complainant claimed that he was entitled to a conveyance from the defendant Clarke, alleging

performance of the contract on his part, and a refusal to perform on the defendant's.

The defendant, in his answer, admitted the execution of the contract, and avowed his willingness and readiness to perform it to the letter; but in excuse for not having already done this, proffered proofs of the following facts:—

That, at the time of the signing of the contract (above quoted), and afterwards during the pendency of the appeal, he was repeatedly informed and assured, by said Martin, that he (Martin) was the only person interested with the defendant in this contract, and that he (said Martin) was the principal therein; and that, in April, 1865, after the the termination of the suit on appeal, one Rollin Mathewson, an attorney and counsellor of this Court, who, from the commencement of the litigation, had acted as counsel for the heirs at law, requested him (this defendant) not to convey any portion of said estate to said Martin, because he, the said Mathewson, was in fact the principal in said contract, and had, at his own cost and charge, done and caused to be done, all that, under said contract, said Martin was bound to do,—the said Martin having been, throughout, simply his agent, for a stipulated rate of compensation,—he, said Mathewson, exhibiting, in corroboration of his statements, an instrument in writing, signed by said Martin, in the words and figures following:—

" Whereas, John H. Clarke and others, who are heirs at law of Eliza Angell, late of North Providence, deceased, have heretofore executed agreements to convey to me one undivided half-part of all their right, title and interest, respectively, in and to all the estate, real and personal, whereof the said Eliza was seized or possessed or entitled to at her decease, now this is to declare that said agreements are and were for the benefit of Brockholst Mathewson, and that my name is used therein as trustee for him and not otherwise, provided that said Mathewson is to pay or secure to me, by good and sufficient sureties if required, the sum of five thousand dollars for my services and commissions in attending to said business, and this declaration embraces all the agreements heretofore made with me by any and all of said heirs.

" And I further declare that the conveyance of their interests, by the said heirs, to me under their said agreements, shall be for the benefit of the said Mathewson, and that I will stand seized and possessed of the same in trust for him, his heirs and assigns, subject only to the payment of the said sum of five thousand dollars to me, my executors, administrators or assigns.

" It is further agreed that I shall have, in addition to the said sum of five thousand dollars, the whole of my share as heir at law to Eliza Angell, free and clear of all expenses of suit; and in case any of the parties shall refuse to convey their share according to said agreement, there shall be deducted from said sum of five thousand dollars a just proportion of the loss suffered thereby.
[Signed,]          " LE BARON MARTIN."

And further, the defendant averred that, subsequently, he received written notices from the counsellors and attorneys of said Mathewson, forbidding any transfers by him to any one other than said Mathewson, and claiming a transfer to said Mathewson; and, furthermore, said, in his answer, that he was informed and believed, that the said Martin, in making and executing said contract and agreement with him, acted therein as the agent or trustee of the said Mathewson, or of some other party, and not as principal; that the said Mathewson is, and at the time of making said contract was, an attorney and counsellor at law in the county of Providence, and, as such, an officer of this Honorable Court; that said Martin had no interest in said contract except as such agent or trustee; that the said Mathewson, or the other parties for whom said Martin contracted as aforesaid, were not, nor was either of them, an heir at law of the said Eliza Angell, and were not, nor was either of them, entitled to, or interested in, any of the said property of the said Eliza, save as under the said contract and agreement, and that said contract and agreement was unlawful and void.

*J. M. Clarke*, for the defendants :—

The contract in question was illegal and void,—1. For maintenance, which is the " officious intermeddling in a suit that no ways belongs to one, by maintaining or assisting either party with

money, or otherwise to prosecute or defend it." 4 Bl. Com. 134. 2. For champerty. " *Campi-partiti* is a species of maintenance, and punishable in the same manner, being a bargain with a plaintiff or defendant *campum partise* to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense." 4 Ib. 135.

When there is no contract to have part of the thing in suit, the party so intermeddling is said to be guilty of maintenance generally; but if the party stipulate to have part of the thing in suit, his offence is called champerty. 1 Rus. on Crimes, 175, 177, 179. By the common law all unlawful maintainers may be indicted and fined. 1 Ib. 181. Champerty is an offence at common law. 6 Dane's Abr. 741, § 41; *Thurston* v. *Percival*, 1 Pick. 415; *Weakly* v. *Hall*, 13 Ohio, 167; 4 Kent's Com. (ed. 1854), 492, note *a* (side p. 449). It is also punishable by statute, as a common law offence. Rev. Stats. 550. An agreement to receive ten per cent. upon the sum which should be recovered, is void. *Thurston* v. *Percival*, 1 Pick. 415. An agreement to pay an agent five per cent. in case he recovers, and, if he does not recover, no more than his actual expenses, amounts to champerty, and is, so far, illegal and void. *Lathrop* v. *President, Directors and Company of Amherst Bank*, 9 Met. 489. The same rule applies to attorneys and clients. 6 Denio, 607; 10 Paige, 352; 3 Vesey, 203; 1 Hoffman's Ch. R. 421; *Holloway* v. *Lowe*, 7 Porter (Ala.), 488. An agreement to communicate such information as shall enable a party to recover a sum of money by action, and to exert influence to procure evidence to substantiate the claim upon condition of receiving a portion of the sum recovered, is illegal. *Stanley* v. *Jones*, 7 Bing. 369 (20 Eng. Com. Law R. 165); see, also, *Frye* v. *Potter* (decided in 1856), 38 Eng. Law and Eq. 67; *Thompson* v. *Ide*, 6 R. I. 217; *Sayles and others* v. *Tibbitts and others*, 5 Ib. 79. Said contract, moreover, was against public policy and against justice, and void.

*B. N. Lapham, for the complainant:—*

Whether Martin acted, as between himself and said third party, as principal or agent or trustee, is of no consequence to Clarke;

he acted as principal to Clarke, and in whatever capacity he acted, the benefit was the same to Clarke. The contract with Martin was assignable. Clarke admits that he has had the benefit of the contract. He·cannot treat Martin as principal, for the purpose of securing the benefit of the performance of the contract by Martin, and then as agent for the purpose of avoiding his part of the contract. Illegality is a defence interposed for the benefit of the public. Where the defendant has received the benefit of a contract, the defence of illegality is unrighteous, and is received by courts of equity with disfavor. The contract must be shown to be illegal,—savoring of illegality is not sufficient. Fry on Specific Perf. of Conts. 155, 214, 215, §§ 204, 307, 309, 311–13 ; *Powell* v. *Knowles*, 2 Atkins, 224 ; *McCallum* v. *Mortimer*, 9 M. & W. 636 ; *Tennant* v. *Elliott*, 1 B. & P. 3. The contract between Martin and Clarke was lawful. Both had an interest in the subject of the suit. 1 Mass. Digest, 206 ; *Call* v. *Calif*, 13 Met. 362; *Findon* v. *Parker*, 11 M. & W. 675 ; *Goodspeed* v. *Fuller*, 46 Maine, 141 ; 4 Vt. 446, and note. As Martin had a legal right to make the contract he had a legal right to sell it, either in whole or in part. Fry on Spec. Perf. of Conts. 104–6, §§ 123, 124. The declaration of trust, purporting to be signed by Martin, only shows this : that Martin acted as principal in the contract with Clarke, and that he had, for a valuable consideration, parted with a part of his interest in it upon conditions.

The answer does not pretend that the contract between Martin and Clarke has ever been altered or varied by anything in writing between the parties. And although, where agents appear on the face of a written contract as principals, it is competent to show that both the contracting parties were agents for other persons, yet parole evidence cannot be given to.show that a party, who appears on the face of the instrument to be personally a contracting party, is not such, for this would be allowing a written contract to be contradicted by parol evidence. 1 Greenl. on Ev. 371, 372 (§ 281) ; Fry on Spec. Perf. 123, and n. (§ 148) ; *Fenley* v. *Stewart*, 5 Sanf. S. C. R. 105 ; *Spencer* v. *Field*, 10 Wend. 88 ; *Penty* v. *Staunton*, 10 Ib. 271; *Newcomb* v. *Clarke*, 1 Denio, 226 ; *Minard* v. *Meade*, 7 Wend. 68 ; *Williams* v. *Chris-*

*tie,* 4 Duer. 29 ; *Evans* v. *Wells,* 22 Wend. 337 ; *Stephen* v. *Cooper,* 1 Johns. Ch. R. 429 ; *Stackpole* v. *Arnold,* 11 Mass. 27 ; *Bank of British North America* v. *Hooper,* 5 Gray, 567 ; *United States* v. *Parmlee,* 1 Paine's C. C. R. 252 ; *Ladd* v. *King,* 1 R. I. 224 ; *Sweet* v. *Stevens,* 7 Ib. 375 ; *Porter* v. *Bradley,* 7 Ib. 541 ; *Bartlett* v. *Pickersgill,* 1 Cox, 15. Again, the contract between Clarke and Martin was for the sale of an interest in real estate, and, by the statute of frauds, must be in writing. It cannot be varied by parole evidence. 1 Hilliard on Vendors, 172 ; *Bartlett* v. *Pickersgill,* 1 Cox, 15 ; *Ladd* v. *King,* 1 R. I. 224. The paper annexed to Clarke's answer, being between other parties, cannot be received to vary a written contract, under seal, between him and Martin. Nor can parole evidence be introduced by Clarke to vary the written contract with Martin, or to affect its validity on the ground of fraud, mistake or accident ; for nothing of that kind is alleged in the answer. Nor could Clarke complain of fraud on account of Martin's transferring a part of his interest in the contract, because it was a part of the contract that he might do so. Fry on Spec. Perf. of Cont. 105, §§ 123, 124.

By enforcing this contract, no principle of public policy is violated ; no injustice is done to the defendant or any one else. By refusing to enforce it, great injustice is done. The defendant is allowed to reap the full benefit of a contract performed by the plaintiff at great expense, and to avoid entirely the performance of his part of it. The facts in the case do not bring it within the law of champerty. The land must be in the adverse possession of another person. Taking a conveyance from a person in possession is lawful. 4 Kent's Com. 446, 447, and note ; Stat. of Henry VIII. ch. 9 ; *Webb* v. *Bendow,* 21 Wend. 98 ; *Sedgewick* v. *Staunton,* 4 Kernan, 289. The adverse possession must be such as to warrant a suit against adverse possession. *Moss* v. *Scott,* 2 Dana, 374 ; 4 Kent, 474, and note. In this case there was no such adverse possession. The possession was in the heirs at law. There must also be an agreement to prosecute the suit. No such agreement here. Martin might do as he pleased about that.

The English law against buying pretended titles (champerty) has not been adopted in this State. The English statutes are of

Edward I., Edward III. and Henry VIII. Not by statute. *Potter* v. *Thornton,* 7 R. I. 252. No English statutes are in force here save such as have been specifically adopted by the General Assembly. 5 Col. Records, 289. Nor by the courts as common law. There is no decision where the law of champerty has been held to be in force. It ought not to be introduced now. The state of society does not require it. The tendency of legislation and of judicial decisions is against it. It was early introduced by statute into some of the States,—Connecticut, New York, Virginia, North Carolina and a few others,—and was also early introduced into Massachusetts, as common law. *Thurston* v. *Percival,* 1 Pick. 415 ; 5 Ib. 348; 9 Mct. 489. In Massachusetts it is adhered to by the courts, but not with favor. 5 Pick. 348. In New York it has been modified by statute, and an intention expressed to abolish it. 4 Kent. 446 ; *Sedgewick* v. *Staunton,* 4 Kernan, 289 (a case somewhat similar to this). Under the code (§ 103), attorneys may contract for a part of the thing recovered. *Benedict* v. *Stewart,* 23 Barb. 420. In the following States, it has not been adopted either by statute or by the courts of common law : New Hampshire, 5 N. H. 181 ; Delaware, 3 Harrington, 139 ; Pennsylvania, 6 Binney, 420, 421 ; Georgia, 23 Georgia, 83 ; Iowa, 3 Iowa, 482–485. Nor has it been adopted in Ohio, Illinois, Mississippi, Missouri or Louisiana. In *Roberts* v. *Cooper,* 20 Howard, 483, it is said the law of champerty and maintenance is not favored in this country. And even in England rights of entry are salable by deed. 8 and 9 Vic. ch. 106, referred to in 4 Kent, 447, note. The statute law of Rhode Island is averse to it. By a supplemental statute any right of entry into real estate may be sold, without regard to the possession. Chap. 359, P. Laws, p. 110. In the revisions of 1844 and 1857, the statutes against champerty, contained in the revisions of 1798 and 1822, and the code of laws of 1647, are omitted. Champerty having been a statute offence in England, from the year 1275 to the time the first code of laws was made in Rhode Island, in 1647, and being made a statute offence by that code, cannot now be considered a common law offence. 3 Edw. I. ch. 25 (1275); 33 Edw. I. Stats. 2, 3 ; Keble's Digest, 69 (1304–5);

32 Hen. VIII. ch. 9, 507 (1541); R. I. Code of Laws of 1647, 18, 41. Nor can it be said to be a common law offence, because there is a provision in the Revised Statutes (p. 550) providing for the punishment of common law offences, for the same provisions were contained in the revision of 1798 (p. 604), and in the revision of 1822 (p. 353), which provided a specific punishment for champerty. It never was a common law offence. In Fitz Herbert's Natura Brevium, published in the reign of Henry VIII., in 1514, is a suit of champerty based entirely upon the statute of Edward I. This shows it not to have been a common law offence.

BRAYTON, J. The bill in this case prays for the specific performance of a contract for the conveyance of certain real estate, made by the defendant with the plaintiff. The parties to the contract were both heirs at law of one Eliza Angell, whose last will and testament had been admitted to probate, and an appeal taken from the probate thereof, was, at the time of making the contract, pending in this court and undetermined. It was, thereupon, agreed that the plaintiff, Martin, should carry on and prosecute the appeal, and all proceedings which should be connected therewith, at his own proper cost and charges, and that the defendants, Clarke and others, in consideration thereof, should, upon the setting aside of said will, or other determination of the suit in favor of the heirs at law, convey and assure to the plaintiff one-half part of all his, the defendant's, right, title and interest in the estate of the said Eliza Angell at the time of her decease. The answer discloses that the plaintiff was, in making this contract, acting as the agent of one Rollin Mathewson, an attorney of this court, and that said Mathewson was not one of the heirs of the said Eliza Angell, nor, at the time of making the contract, was he, in any wise, interested in the subject-matter of said appeal; and the answer claims that the said contract sought to be enforced was therefore champertous, illegal and void.

The question raised in the argument, upon the bill and answer, is, whether a sufficient defence is disclosed. The complainant insists that there is not; that the agreement was one required by the statute of frauds to be in writing, and, as writ-

ten, it is a contract with the said Martin as principal, and inasmuch as both the parties had an interest in the matter in suit, the agreement is not open to any such objection as that it is champertous or illegal.

It is further agreed, that as it is not pretended by the respondent that the contract has been altered or varied by any other writing between the parties, it is not competent for him to prove that it was other or different from that which the writing shows, and that the rule which excludes parol evidence to contradict, add to, or vary that which is contained in a written instrument, will not permit the defendant to prove, by parol, that Martin was agent merely and not the principal, as the written contract purports. The rule referred to will exclude parol proof of that which is here set up in the answer. It does not extend to evidence offered to show that the contract was made for the furtherance of objects forbidden by law, either by statute, by the common law, or by the general policy of the law. 1 Greenl. Ev. § 248.

The making of the agreement is here admitted, and the parties to it and its terms are as the writing shows; but, nevertheless, it is said—and it is proposed to be proved—that it was made with the intent, on the part of the contracting party, to accomplish an illegal purpose, and as part of a scheme for that end, viz., to call in the aid of a party not before interested in the matter in suit, to carry on the suit at his own costs and charges, for part of the subject in litigation. The rule excluding parol evidence will not prevent a court, either of law or of equity, from looking through all disguises in order to detect fraud or illegality, and from inquiring into the true nature of the transaction and the intent of the parties in this regard. The case of *Collins* v. *Bayntum*, cited by Greenleaf to this point, was a case at law, and the objection there was to a plea alleging that the bond sued was money advanced to compound the crime of perjury, and as the bond was for the payment of money only, which was legal, it was not competent to allege or prove the unlawful consideration, the unlawful purpose of its payment. The answer of the court, by Wilmot, C. J., to this point, is by way of interrogatory :—

" What strange absurdity," said he, " would it be for the law to say that the contract is wicked and void, and in the same breath to say you shall not be permitted to plead that which shows it to be so ?    It is a transaction to gild over and conceal the truth, and whenever courts of law see such attempts, they will brush away the disguise and show the true nature of the transaction."

Another case is that of *Paxton* v. *Popham,* 9 East. 416, where the plea stated facts inconsistent with, and contradictory to, the condition of the bond, it was held, that unless this were permitted, bonds would be made to cover any species of illegality and wickedness.    The same principle which allows the illegality to be alleged, allows the allegation to be proved, if need be, by parol evidence.

For anything that appears to us, it is competent for the respondent to prove what is alleged in this answer, that the contract was made in fact in the name of Martin, but for the benefit of Mathewson, and with the intent the estate agreed to be conveyed should vest in Mathewson, who had no interest in the suit aside from the contract, and to be a consideration to him for carrying on, at his own sole cost and charges, the suit then pending, to its final termination.

It is quite clear that if they succeed in proving this, they will have proved a transaction champertous in its nature and—if the law of champerty be in force here—illegal and void.

It is said, however, and insisted, that no principle of public policy is violated by enforcing this contract, and that there is no law against champerty in force in this State.    It is urged, in support of this position, that there is no adjudication here, that any such law exists that champerty is unlawful.

The reply of Lord Kenyon, to a like suggestion, in a case before him, might account for the absence of any solemn determination in this case as well as in the one before him, viz., " that the *nisi prius* determinations were thought too clear to be questioned."    There are, however, in our own reports two cases in which the inquiry was, whether the contract in question was champertous, and, for that reason, void.    The fact that such question was raised and discussed implies that it was deemed, by

the counsel and the court, a material one, which could not be, if being champertous it were not illegal. Neither case, however, holds expressly that champerty would avoid the contract. The fact of champerty was not found.

It is argued further, that it could be an offence here only by force of section 1 of chapter 219 of the Revised Statutes, which provides that "every act and omission which is an offence at common law, and for which no punishment is prescribed by this title, may be prosecuted and punished as an offence at common law," and that champerty never was an offence at common law, and so is not within that section. The argument assumes that it is necessary to maintain that this was an offence by the ancient common law of England. If it were necessary to establish this, that champerty was held to be illegal and punishable by the ancient common law, the standard authorities would seem to render it entirely clear that it was so from the earliest times. Lord Coke, commenting upon the Statute of Westminster I., c. 25, the earliest English statute upon the subject, says it was against those maxims of the common law, viz., "*culpa est se immiscere rei se non pertionenti,*" and this other, "*pendente lite nihil innovetur.*" He cites Bracton, who wrote before the statute, to show that it was one of the articles inquirable by the justices in Eyre before the reign of Edward I., whether suits had been stirred up by certain officers, by which justice and truth might be suppressed or delayed. He also cites Fleta for the same purpose, that suits had been thus prosecuted, and he reasons thus, that it appears that the end of maintenance is to suppress truth and justice, or at least to work delay, and is therefore *malum in se,* and against the common law, and if maintenance *in genere* be so, much more is that worst species of it called champerty. This view is supported by every law writer since the days of Lord Coke and the reign of James I. Blackstone (vol. 4, p. 135) characterizes the offence as one against public justice, as it keeps alive strife and contention and perverts the remedial process of the law into an engine of oppression. This is repeated by Judge Story (Equity Juris. § 1048), who says it is an offence as well by the common law as by statute. Lord Eldon says it is against the general princi-

ple of policy. In *Willer* v. *Duke of Portland,* 3 Ves. 494, Lord Roslyn said it is laid down as a fundamental authority, that maintenance is not *malum prohibitum,* but *malum in se,* and that all the law books state it to be not upon the statute. Tindal, C. J., in a late case of *Stanley* v. *Jones,* 7 Bing. 369, considered *the principle upon which it rests as not confined to the common law of England, but that champerty was considered, in the earliest times and in all countries, as an offence of great mischief to the public.* Chancellor Kent, in his Commentaries, holds, also—using his own language—that "the statutes of champerty are founded on a principle common to the law of all well governed countries, that no encouragement shall be given to litigation by the introduction of parties to enforce those rights which others are not disposed to enforce." Then it is suggested by Lord Coke that there was reason for passing the statute against this common law offence, "that the statute gives a greater punishment than was by the common law; that the first statutes were directed against the king's ministers in his court, because they were in place to do more mischief by subverting justice and truth than others." In the Statute, 28 Edw. I. c. 11, it is provided that that statute shall not restrain one from having advice and direction in law from those learned in the law, " *consaile des countours et des sages gents,*" yet if a sergeant-at-law, apprentice or attorney, take a feoffment having the plea to maintain, though it be *pro suo dando,* in lieu of his fees, yet it is champerty, for this is to become party, and is in no sort allowed." And it is not allowed for the reason given for the Statute of Westminster I. It was the worst species of maintenance. It was against those who, by their place, might do most mischief in perverting the law to an engine of oppression, and suppressing justice and truth.

And that the place of an attorney is regarded in this light may be seen from the case of *Welles* v. *Middletown,* 1 Cox, 125, where it was held, as well settled, that an attorney cannot take a gift while the client is in his hands, not even instead of his bill; and the chancellor said there would be no bounds to the crushing influence of the power of an attorney, who has the affairs of the

client in his hands, if it were not so; and, upon general princi-
ples of policy, a just gift will be set aside.

These statutes against champerty did not repeal the common
law prohibition, because a statute merely in affirmance of the
common law does not repeal it. It is only where a statute en-
acts what is inconsistent with the rule of law before existing that
it operates to repeal, whether the prior rule were one of the com-
mon law or prescribed by statute. For the same reason, the code
of laws made in 1647, under the patent of 1643–4, containing a
prohibition of this offence, did not alter the common law here,
more than the statutes of Edward I. did in England. So the
common law on this subject never was repealed.

A colonial statute passed soon after the charter of 1663 pro-
vided that any person convicted of champerty should be pun-
ished by one year's imprisonment, and make fine to the colony
as the judges should award. This act does not define the offence;
it prescribes the punishment only, and we are left to inquire if
that common law which the colonists brought with them for the
definition of the offence which this act implies was existing.
This act continued in force down to 1844, substantially as it was
originally enacted.

In 1749–50, another act was passed by the colonial legislature,
in order to avoid some question which had arisen, which declared
that (among other statutes of England) all statutes that are against
criminal offenders, so far as they are descriptive of the crime, and
where the law of the colony hath not described and enjoined the
punishment, then that part of the statute that relates to the pun-
ishment also " shall be in force until the general assembly order
otherwise." So this legislation continued down to the revision
of the law in 1844, the act prescribing the punishment of cham-
perty as well as the act declaring the English statute descriptive
of that offence continuing in force here.

In the revision of 1844, the act prescribing the punishment
was repealed, and, in the sixth section of the act establishing that
digest, it was provided that " when no provision is made either
at common law or by the statutes aforesaid [the Revised Stat-
utes], such statutes as were introduced before the Declaration of

Independence and as have been continued in force, shall be considered as part of the common law, and remain in force until the general assembly provide therefor." So the offence is recognized by these acts as still existing.

Suppose, however, that champerty were not an offence at the common law, and were first made illegal by the Statute of Westminster I., the answer to the question, if it be now an offence here? must still be the same. If there had been no legislation here upon the subject, the colonists here, upon their emigration, brought with them, to this country, the law of England as it then existed, as modified by statutes, so far as it was applicable to their condition and circumstances here, and this statute, as part of that law, became a part of the common law of this country.

Whether we look, therefore, at the ancient common law, to the English statutes upon the subject, or to our own legislation, the conclusion must be the same,—that champerty is an offence against the law. Being such, it must avoid every contract into which it enters.